IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **MOHAMMED ELSEIDY,** | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 2023-cv-3281** |
| | ) | |
| v. | ) | |
| | ) | |
| **MOHAMED ELKASSTAWI,** | ) | **Hon. April Perry** |
| Defendant. | ) | |
| ***CONSOLIDATED WITH*:** | | |
| **IMRAN KHAN,** | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 2023-cv-15554** |
| | ) | |
| v. | ) | |
| | ) | |
| **MOHAMED ELKASSTAWI,** | ) | |
| Defendant. | ) | |
| | ) | |
| **MOHAMED ELKASSTAWI,** | ) | |
| | ) | |
| Counter-Plaintiffs | ) | |
| | ) | |
| v. | ) | **Jury Demanded** |
| | ) | |
| **IMRAN KHAN, and** | ) | |
| **MOHAMED ELSEIDY** | ) | |
| | ) | |
| Counter-Defendants. | ) | |

**RESPONSE TO PLAINTIFFS' RULE 12(b)(6) MOTION TO DISMISS
DEFENDANT'S AMENDED COUNTERCLAIM**

NOW COMES Counter-Plaintiff, MOHAMED ELKASSTAWI, by and through his attorneys, SWANSON, MARTIN & BELL, LLP, and in Response to Counter-Defendants' Motion to Dismiss, states as follows:

1

## INTRODUCTION

Mohamed ElKasstawi, the Counter-Plaintiff, had an arrangement with his father, Ibrahim ElKasstawi, whereby Mohamed ElKasstawi would make recommendations to his father for cryptocurrency investments and Mohamed ElKasstawi would receive a portion of the proceeds. Imran Khan ("Khan"), and Mohamed ElSeidy ("ElSeidy" and together with Khan "Counter-Defendants") wanted to invest in pre-ICO cryptocurrency offerings both for the potential upside and to bolster their reputations in the crypto community. To invest in cryptocurrency prior to its ICO, however, they needed to make a larger investment than they were able to make. Lacking the required funds, they made a series of false statements that induced Mohamed ElKasstawi to ignore other opportunities and recommend the ones presented, under false pretenses, by ElSeidy and Khan. This misplaced reliance harmed ElKasstawi as he lost out on the opportunity to benefit from more appropriate investments. This is a classic example of tortious interference with a business expectancy, and Mr. ElKasstawi is not judicially estopped from pursuing his claims. Counter-Defendants Rule 12(b)(6) motion to dismiss should be denied.

## STATEMENT OF FACTS

In 2017, Mohamed ElKasstawi began discussing cryptocurrency investing with Counter-Defendants. Dkt. 54, ¶ 8. As they discussed these matters, ElSeidy and Khan represented to Mohamed ElKasstawi that they had extensive experience and knowledge in successfully researching and investing in cryptocurrency. *Id*. ¶¶ 9, 11. Khan and ElSeidy wanted to invest in pre-ICO offerings, which meant acquiring crypto tokens prior to their listing on an exchange. *Id*. ¶ 19. However, neither ElSeidy nor Khan had sufficient industry recognition or capital to get a preferred allocation in a pre-ICO offering. *Id*. ¶ 20. Therefore, ElSeidy and Khan formed a group with Mohamed ElKasstawi hoping to pool funds. *Id*.

2

### *The Agreement*

At the same time, Mohamed ElKasstawi had an agreement with his father, Ibrahim ElKasstawi, that Ibrahim ElKasstawi would invest in cryptocurrency investment opportunities that Mohamed ElKasstawi brought to him (herein after the "Agreement"). Dkt. 54, ¶ 20. Under this Agreement, Mohamed ElKasstawi's father intended to compensate Mohamed ElKasstawi a portion of the proceeds from successful cryptocurrency investments recommended by Mohamed ElKasstawi. *Id*. ¶ 20. ElSeidy and Khan knew of this Agreement. *Id*. ¶ 28. Because Counter-Defendants knew how important Ibrahim ElKasstawi was to having sufficient funds to be eligible for pre-ICO investments, they followed up on Mohamed ElKasstawi's recommendations by discussing the matters themselves with Ibrahim ElKasstawi. See e.g. Dkt. ¶¶ 47-57. Unfortunately, to induce the ElKasstawis to act, ElSeidy and Khan made a series of false statements.

### *Origin Protocol Opportunity*

The first potential investment opportunity was a recommendation to invest in the pre-ICO for Origin Protocol. Around January 2018, Khan represented that Origin Protocol was a good investment, that they would not lose their principle, and that the value of tokens would increase by at least 10 times. Dkt. 54, ¶¶ 21, 54. Khan's representations were untrue. *Id*. ¶¶ 54, 55. Khan also falsely represented that Ibrahim ElKasstawi would be able to cash out of the transaction once the tokens were distributed. *Id*. ¶¶ 54, 55.

### *The RightMesh Opportunity*

In February 2018, Khan recommended an investment opportunity in a project called RightMesh. Dkt. 54, ¶ 24. Khan, who was an early investor in RightMesh, represented that this was a "must-invest" opportunity. *Id*. ¶ 25. Khan also represented to Mohamed ElKasstawi that, in his role as an early investor for RightMesh, he was assisting it in finding potential investors. *Id*. ¶

3

30. ElSeidy represented to Mohamed ElKasstawi that he had performed due diligence on RightMesh, and that RightMesh had a working product. *Id*. ¶¶ 31, 32. Both Khan and ElSeidy's representations were false. *Id*. ¶¶ 40, 43. Notably, ElSeidy did not perform any due diligence because as it turned out, RightMesh did not have a working product.

Based on these false representations that RightMesh presented an excellent investment opportunity, Ibrahim ElKasstawi invested $50,000 USD (via Ethereum) in RightMesh. *Id*. ¶ 33. In February 2018, Khan represented that he would be increasing his investment in RightMesh. *Id*. ¶ 35. With this information and Khan's previous representations of knowledge and expertise in successfully investing in cryptocurrency, Mohamed ElKasstawi recommended Ibrahim ElKasstawi make another investment to $100,000 in RightMesh. *Id*. ¶ 35. After Khan represented Shapeshift, an exchange, wanted to invest in RightMesh, Ibrahim ElKasstawi increased the investment to $200,000 in RightMesh. *Id*. ¶¶ 38, 39.

Undisclosed to the ElKasstawis, it turns out that Khan seems to have held undisclosed economic incentives to induce others to invest in this project. *Id*. ¶ 40. Furthermore, Khan knew, or at a minimum certainly should have known, that RightMesh was in trouble, and yet he continued making false representations about the RightMesh opportunity to Mohamed ElKasstawi. *Id*. ¶ 41. Khan purposefully failed to disclose these facts to Ibrahim ElKasstawi or Mohamed ElKasstawi at the time Ibrahim ElKasstawi made his investments. *Id*. ¶ 42.

Ibrahim ElKasstawi lost his investment in RightMesh. *Id*. ¶ 44. And Mohamed ElKasstawi lost his expected profits, after being induced by the false representations to recommend the investment as the RightMesh tokens are now worth $0. *Id*. ¶ 45.

4

*The Namebase Opportunity*

In October 2019, Khan represented that he had a new cryptocurrency investment opportunity called Namebase. Dkt. 54, ¶ 46. Khan suggested to Ibrahim ElKasstawi the two pool their assets so Khan could participate in the pre-ICO for Namebase. *Id*. ¶ 47. At that time, Khan made a number of false representations to induce Ibrahim ElKasstawi in his suggested actions. *Id*. ¶ 49. For example, Khan falsely represented that Namebase was run by a great team, that there was no way the parties could lose their principle investment, and that they could case out as soon as they got their tokens. *Id*. ¶ 49. To further induce Ibrahim ElKasstawi to make the investment in Namebase, ElSeidy purported to performed due diligence, and falsely represented that Namebase had a working product. *Id*. ¶ 50.

Khan's false representations induced Ibrahim ElKasstawi to transfer $50,000 to Khan, so that Khan could pool resources with him, and invest $75,000 total in Namebase on a pre-ICO basis. *Id*. ¶¶ 51, 52. Despite representations otherwise, Khan never provided Ibrahim ElKasstawi with the ability to sell his tokens. *Id*. ¶ 53. As a result of Khan and ElSeidy's actions and misrepresentations, Mohamed ElKasstawi lost millions of dollars from various cryptocurrency investments, and lost his opportunity to benefit from the growth of these investments. *Id*. ¶ 57.

**ARGUMENT**

Mohamed ElKasstawi and his father, Ibrahim ElKasstawi agreed that Mohamed ElKasstawi would bring crypto investment opportunities to his father in exchange for a portion of the profits. (See Dkt. 54, ¶ 20). So Mr. ElKasstawi sought potentially lucrative investments. Meanwhile, Khan and ElSeidy wanted to bolster their reputations by making investments in pre-ICO cryptocurrency offerings. So they misled Mohamed ElKasstawi into believing certain investments had been properly vetted, causing Mohamed ElKasstawi to make the investment

suggestions to his father. Contrary to Khan and ElSeidy's representations however, the investments were not appropriately vetted and the representations that induced Mohamed ElKasstawi were false. These statements damaged Mohamed ElKasstawi because he did not realize the expected gains and lost the opportunity to make more appropriate recommendations.

### I. Tortious Interference is Well Pled

Applying Illinois law, the legal claim for these bad acts is tortious interference with a business expectancy, which is properly pled when: 1) there is a reasonable expectation of entering into a valid business relationship; 2) the defendant has knowledge of that expectation; 3) the defendant purposely prevents the plaintiff's legitimate expectancy from ripening, and 4) damage to the plaintiff resulting from the defendant's interference. *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004). To survive a motion to dismiss, the plaintiff must give enough details about the subject matter of the case to present a story that holds together. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F. 3d 730, 736 (7th Cir. 2019). Here, the necessary facts are pled, and this Court should deny the Motion to Dismiss.

### A. Mohamed ElKasstawi's Reasonable Expectancy of a Business Relationship.

To establish the first element for tortious interference, the plaintiff must allege that he had a reasonable expectancy of entering into a valid business relationship. *Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F.Supp.2d 665, 674 (N.D. Ill. 1998). Here, Mohamed ElKasstawi's tortious interference claim is well pled. The first element for tortious interference with a business expectancy is met because Mohamed ElKasstawi had an oral agreement with his father, Ibrahim ElKasstawi, where Mohamed ElKasstawi would receive a share of proceeds from investments made by Ibrahim ElKasstawi in exchange for locating investment opportunities for Ibrahim

ElKasstawi, and reasonably expected that relationship to continue. (Dkt. 54, ¶¶ 27, 59, 60). These allegations establish the first element of tortious interference with a business expectancy.

### B. Counter-Defendants Knew of the Business Expectancy.

To establish that the defendants knew of the business expectancy, it is only necessary for the defendant to have knowledge of the relationship's existence, not the specific details of the plaintiff's prospective business relationship. See e.g. *Malatesta v. Leichter*, 186 Ill.App.3d 602, 619 (1st Dist. 1989). Indeed, when the defendants are aware of a business relationship, then knowledge is sufficiently pled, without reference to the details. Q*Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 2023 IL App (3d) 220324, ¶ 33. For example, in *MG Design Assoc., Corp v. CoStar Realty Inform., Inc.*, the District Court appropriately held that the knowledge of the agreement was properly pled when defendant's knowledge of the industry allowed the Court to infer that the defendants knew they were taking another's business opportunity. 267 F. Supp. 3d 1000, 1023 (N.D. Ill. 2017).

Here, ElSeidy and Khan knew about the Agreement. (Dkt. 54 ¶ 28). And if that alone were not enough, there are numerous factual allegations that further demonstrate there was a business relationship between the ElKasstawis. For example, Mohamed ElKasstawi connected Khan to Ibrahim ElKasstawi for the Namebase opportunity – after he was misled about the value of that opportunity. (Dkt. 54, ¶¶ 47-57). ElSeidy transferred funds to Ibrahim ElKasstawi, knowing he was the one who was actually making the investment. (Dkt. 54, ¶ 34). Similarly, Khan knew that it was Ibrahim ElKasstawi making the investments recommended through Mohamed ElKasstawi. (Dkt. 54, ¶ 41). Sufficient facts are pled here, and Counter-Defendants' denial of that allegation is not a basis for granting a motion to dismiss.

### C. Counter-Defendants Purposefully Interfered.

"A claim of intentional interference 'must set forth facts which suggest that defendant acted with the purpose of injuring plaintiff's expectancies.'" *Advantage Marketing Group, Inc. v. Keane*, 436 Ill.Dec. 644, 658, (1st Dist. 2019). "But the case law requires no more than a defendant's purposeful interference that prevents the plaintiff's legitimate expectancy." *Johnson Controls, Inc. v. Exide Corp.*, 129 F. Supp. 2d 1137, 1148 (N.D. Ill. 2001) (quoting *Dowd & Dowd Ltd., v. Gleason*, 181 Ill. 2d 460, 484-85 (Ill. 1998). Purposeful interference is satisfied when there is impropriety in the defendant's actions. *Id.* And thus, it is not necessary to allege that interfering with the business expectancy was the intent. *Johnson Controls*, 129 F. Supp. 2d at 1148. As the Seventh Circuit has recognized, false statements, regardless of intent, are frequently the basis of tortious interference claims. *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 172 (7th Cir. 1993) (collecting cases).

This standard is easily met here. ElSeidy and Khan purposefully interfered in the ElKasstawi's business relationship by making numerous false statements to Mohamed ElKasstawi. These false statements include Khan's representation that RightMesh was a "must-invest" opportunity. (Dkt. 54, ¶ 25). ElSeidy represented that RightMesh and Namebase had a working product. (Dkt. 54, ¶¶ 43, 50). Khan represented that Namebase was run by a great team, there was no way the parties could lose their principle, and they could cash out as soon as they got their tokens, and the value of their tokens would increase by at least 10x. (Dkt. 54, ¶¶ 49, 54). These false representations were made for the Counter-Defendants' own benefit, as they had undisclosed economic incentives to induce others, including Mohamed ElKasstawi, to invest in these projects. (See Dkt. 54, ¶¶ 25, 30, 32, 40).

Thus, there are sufficient factual allegations to establish the third element for tortious interference with a business expectancy, in that Counter-Defendants purposefully made false representations to interfere with Mohamed ElKasstawi's future expected share of proceeds and acted for their own benefit. Therefore, Mohamed ElKasstawi has an actionable claim for tortious interference.

### D. The Interference Harmed Mohamed ElKasstawi.

Counter-Defendants also move to dismiss Mohamed ElKasstawi's tortious interference claim for failure to allege facts establishing damages as a result of Counter-Defendants' purposeful interference with a viable business expectancy. Yet again, Mohamed ElKasstawi pled sufficient facts to establish damages as a result of Counter-Defendants' purposeful interfere with a business expectancy.

To establish a claim for tortious interference, plaintiff must prove damages, which may include lost profits. *Dowd and Dowd, Ltd. v. Gleason*, 352 Ill.App.3d 365, 383 (1st Dist. 2004). Under Illinois law, damage or injury can include the loss of potential income, and an existing contract is not required. *City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill.App.3d 359, 363 (Ill. App. 1973). When a party loses the benefit of a contract, courts infer that there are damages, even if the precise damages must later be proven. *D 56, Inc. v. Berry's Inc.*, 995 F. Supp. 908, 919 (N.D. Ill. 1997). Mohamed ElKasstawi easily clears this bar.

Mr. ElKasstawi had an agreement with a third party, and but for the allocation of resources to the fraudulently induced investments, he would have realized the opportunity to benefit from that bargain by pursuing opportunities that were not fraudulently induced. (Dkt. 54, ¶¶ 45, 57, 67). Thus, there are sufficient factual allegations to establish the fourth element for tortious interference with a business expectancy, in that Mohamed ElKasstawi suffered damages as a result of Counter-

9

Defendants' conduct. Therefore, Mohamed ElKasstawi has an actionable claim for tortious interference.

## II. Judicial Estoppel Does Not Apply

Counter-Defendants' evocation of judicial estoppel is inappropriate for a multitude of reasons. First, equitable estoppel only applies when a party's later position is inconsistent. Second, judicial estoppel only applies when there is judicial acceptance of the earlier position. Third, judicial estoppel is limited to circumstances where a party would derive an unfair advantage.

First and foremost, Mohamed ElKasstawi's position in the earlier litigation does not contradict his position here. In the prior litigation, alleging trade secret misappropriation, he did not recall at his deposition whether or not he made investments with the Counter-Defendants, and was unsure if his father actually executed on any. That does not contradict the fact that he has not reviewed his records and talked to his father to learn what happened. Furthermore, in the deposition, Mohamed ElKasstawi explained that he needed a moment to try to recall the answer to certain questions, and counsel for Counter-Defendants asked him to give a quick answer so they could "move on." See Dkt. 55-1 at pp. 20-21. Judicial estoppel does not apply when there is no actual inconsistency. *Burns v. First American Bank,* 2006 WL 3754820, at *5 (N.D. Ill., 2006). So given the consistency, there is nothing chameleonic here.

A second problem is that there were no judicial findings on these alleged facts. Nothing in Counter-Defendants' argument suggests otherwise. And whether the party has succeeded in persuading a court by taking the earlier position is a vital element of judicial estoppel. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

Finally, Mohamed ElKasstawi does not gain any advantage here. Nor do Counter-Defendants argue he does. Indeed, Counter-Defendants could not articulate why they would incur

an unfair detriment and Mohamed ElKasstawi obtained an unfair advantage if the court declined to apply judicial estoppel. *New Hampshire v. Maine*, 532 U.S. at 750-51.

Counter-Defendants fail to show that any of the three elements of judicial estoppel are met, and therefore, judicial estoppel does not apply.

## CONCLUSION

For the foregoing reasons, Mohamed ElKasstawi respectfully requests that this Court deny Counter-Defendants' motion to dismiss in its entirety.

**Dated: March 25, 2025**

                Respectfully submitted,

                */s/ William D. Patterson*

                One of the Attorneys for Defendant/Counter-Plaintiff, Mohamed ElKasstawi.

William D. Patterson
Troy M. Sphar
**Swanson, Martin & Bell, LLP**
330 N Wabash – Suite 3300
Chicago, IL 60611
(312) 321-9100
Fax (312) 321-0990
wpatterson@smbtrials.com
tsphar@smbtrials.com

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of March 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which simultaneously provided electronic notice to all counsel of record.

                                                                                     */s/ William D. Patterson*

                                                                                     William D. Patterson